UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| L.C., as parent and next friend of B.C., a minor, } } } | |
| Plaintiff, } } | |
| v. } } | Case No.: 7:15-CV-750-RDP |
| TUSCALOOSA COUNTY BOARD OF EDUCATION, } } } } | |
| Defendant. } | |

### MEMORANDUM OPINION

This case is an appeal from an administrative due process hearing conducted under the Individuals with Disabilities Education Act ("IDEA"). (Doc. # 1). Plaintiff has moved for summary judgment. (Doc. # 17). The Motion has been fully briefed. (Docs. # 20, 21).

**I.   Facts**

B.C. is an eight-year-old student who has been diagnosed with Tourette Syndrome ("Tourette") and is currently attending third grade at a school in the Tuscaloosa County School Board of Education system. (Doc. # 8-9, p. 200). L.C. is his mother and legal guardian. The Tuscaloosa County Board of Education is the local education agency for the area where B.C. and L.C. reside. (*Id.*)

B.C.'s parents referred him for a special education evaluation on May 19, 2014. (Doc. 8-14, p. 11). The day after the parent referral, on May 20, 2014, the District conducted an observation of B.C. (Doc. 8-12, p. 4).

A special education referral meeting was held on May 28, 2014. The team accepted the referral and agreed to conduct a special education evaluation. (Doc. 8-14, pp. 15, 19-23).

The special education evaluation of B.C. included an achievement test, an intelligence test, behavior rating scales, observations of B.C., examination of standardized assessments, and examination of medical documentation and B.C.'s work samples. (Doc. 8-12, pp. 4-9). Progress monitoring of reading skills administered in the classroom showed that B.C. was on target or above. (Doc. 8-4, p. 3). B.C.'s DIBELS assessment demonstrated that B.C. was exceeding benchmarks. (Doc. 8-14, pp. 4-6; Doc. 8-4, p. 4). B.C. was found to be achieving at or above grade level and was mastering the standards for his grade level. (Doc. 8-21, pp. 13-16; Doc. 8-4, p. 371; Doc. 8-14, p. 8).

B.C.'s behavior rating scales revealed average scores. (Doc. 8-5, p. 20). B.C.'s achievement tests were all within the average range. (Doc. 8-4, p. 21). B.C.'s reading fluency score was a 109, which is in the high average range. (Doc. 8-6, p. 19). B.C.'s work samples illustrate a mastery of skills. (Doc. 8-4, p. 21). Reading fluency scores for B.C. provided by Dr. John Goff were consistent with the District's scores. (Doc. 8-6, p. 20; Doc. 8-12, p. 35; Doc. 8-12, p. 6). Dr. Goff's test results revealed B.C. was performing in the normal range for children of the same age. (Doc. 8-4, p. 22; Doc. 8-12, p. 6). And B.C.'s second grade teacher did not observe anything that was interfering with B.C.s ability to perform academically. (Doc. 8-4, p. 5).

The special education eligibility meeting was held on July 7, 2014. (Doc. 8-12, pp. 4-9). B.C.'s eligibility team was comprised of his mother, a general education teacher, a special education teacher, the District's special education coordinator, and a school psychologist. (Doc. 8-12, p. 9; Doc. 8-4, p. 11; Doc. 8-6, pp. 14-20). At the eligibility meeting, the team considered whether B.C. satisfied the criteria for special education in the classifications of other health

impairment[1] and specific learning disability.[2]  (Doc. 8-12, pp. 4-9; Doc. 8-4, p. 368; Doc. 8-5, pp. 20-21).

The eligibility team found that B.C. did not meet the criteria for special education eligibility.  (Doc. 8-12, pp. 4-9; Doc. 8-5, pp. 20-21).  The eligibility team found that, at that time, B.C. was not in need of specially designed instruction in order to access and participate in the general curriculum.  (Doc. 8-12, p. 9).  Therefore, the July 2014 eligibility team determined that B.C. was not eligible for special education services.  (Doc. 8-12, pp. 4-9).  Nonetheless, during the 2014-2015 school year, B.C. received accommodations via a Section 504 plan.  (Doc. 8-16, pp. 8-9).

On October 7, 2014, B.C.'s psychiatrist wrote the school system and requested modifications to his Section 504 plan including extra time to complete his work, dividing work into smaller parts, and a quiet environment for B.C. (Doc. # 8-9 at 19).

---

[1] Under Alabama IDEA regulations, Other Health Impairment:

means having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette Syndrome. If a medical diagnosis is presented, the medical diagnosis alone is not enough to justify being identified in the area of other health impairment. *The impairment must adversely affect the educational performance of the child.*

Ala. Admin. Code  § 290–8–9–.03(9)(a) (emphasis added)

[2] Alabama's IDEA regulations define Specific Learning Disability as:

a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

Ala. Admin. Code § 290–8–9–.03(10)(a).  Alabama's IDEA regulations require that a child must meet six criteria prior to being classified as having a Specific Learning Disability, including that "[t]he child *does not achieve adequately for the child's age or meet State-approved grade-level standards* … ." Ala. Admin. Code § 290–8–9–.03(10)(c) (emphasis added).

On November 3, 2014, B.C.'s parents initiated another referral for special education. (Doc. # 8-9 at 20). On November 17, 2014, a second special education referral meeting was held. At that time, B.C. was on the honor roll but the grades he was bringing home were much poorer. (Doc. # 8-9 at 20-21). The third grade teacher testified that she was accommodating B.C.'s grades and not counting against him work he could not do, was afraid to do, or was incorrect. (Doc. # 8-9 at 21). The team accepted the referral and agreed to conduct another special education evaluation. (Doc. 8-11, pp. 25-28).

Despite the initiation of this process and the team's acceptance of the referral, the next day, on November 18, 2014, L.C. filed a Due Process Complaint on behalf of B.C., including a request for a due process hearing. (Doc. # 8-10 at 13-19; Doc. # 8-9 at 3).

The second special education eligibility meeting was held on January 13, 2015. B.C. qualified to receive special education services in the classification of Other Health Impairment. (Doc. 8-22, pp. 13-19).[3] The District developed an Individualized Education Plan for B.C. on January 13, 2015. (Doc. 8-21, pp. 30-32; Doc. 8-22, pp. 1-11).

## II.     Procedural Background

On November 18, 2014, L.C., on behalf of B.C., filed a Due Process Complaint requesting a hearing under the IDEA. (Doc. # 8-10 at 13-19; Doc. # 8-9 at 3). The Due Process Complaint alleged that B.C. is eligible for services as a student with disabilities and that the Board had denied B.C. a free and appropriate public education ("FAPE") by: (a) failing to identify B.C. under its Child Find obligation; (b) failing to develop and implement an IEP; (c) failing to consider B.C.'s parents equal participants; (d) failing to understand the role of special education for children with disabilities, (e) failing to develop and implement a behavior

---

[3] The signs and symptoms of Tourette Syndrome change. One day they will manifest themselves as a tic and then the next day the symptoms will manifest themselves in an entirely different manner such as slapping the forehead or other similar involuntary body movements. (Doc. # 8-9 at 203).

4

intervention plan; (f) failing to provide B.C. the services of personnel professionally trained in behavior management; and (g) failing to develop and provide B.C. with extended school year services. (Doc. # 8-10 at 13-19; Doc. # 8-9 at 3). L.C. also asserted that, after the referral of the child for special education services, the school system had not properly evaluated the child. (*Id.*) The final allegation asserted that personnel for the local education agency who attended the referral and special education eligibility meetings did not consider the parents as equal participants in the development of the child's educational program. (*Id.*).

A hearing was conducted over a period of three non-consecutive days on February 2, February 3, and February 13, 2015, before Hearing Officer, Wesley Romine, Esq. On March 13, 2015, the Hearing Officer issued a decision finding that the Board had failed to provide a FAPE to B.C. by failing to comply with its child find duties which required it to locate, identify, and evaluate all children in their jurisdiction who need special education services regardless of the severity of the disability. (Doc. # 8-9 at 24-25; Doc. # 8-10 at 238). In connection with the violation of its child find duties, the District was ordered to provide training to participating school system personnel regarding special education services, to include a specific discussion and/or information regarding Tourette Syndrome. (Doc. # 8-10 at 239).

The Hearing Officer also determined that the District committed a procedural violation of the IDEA in failing to have the child's second grade general education teacher and the counselor who conducted one of the observations of the child present at the July 7, 2015 eligibility meeting. (Doc. # 8-10 at 238-39). The District was ordered to take steps to ensure that the parents of children who are seeking eligibility for special education services have an opportunity to be equally involved in the referral/eligibility meeting. (Doc. # 8-10 at 239). However, the

Hearing Officer determined that the school district had complied with the IDEA in all other respects with regard to L.C.. (Doc. # 8-10 at 242).

On April 3, 2015, L.C. filed a notice of intent to appeal parts of the Hearing Officer's decision. (AR 195; Part 9).  L.C. only challenges the Hearing Officer's findings that the school district correctly determined that B.C. was not eligible for services at the first eligibility meeting and complied with the IDEA in "all other respects." (Doc. # 8-10 at 240-42, paragraphs 4, 5, 6 & 10).

## III.   Standard of Review

The district court's review on Plaintiff's IDEA claim is in the nature of an appeal, but it is not limited to the administrative record.  *Weiss v. Sch. Bd. of Hillsborough County*, 141 F.3d 990, 992 (11th Cir. 1998).  In the IDEA context, an administrative decision in an IDEA case "is entitled to due weight and the court must be careful not to substitute its judgment" for that of the hearing officer.  *Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000), citing *Jefferson Cnty. Bd. of Educ. v. Ala. Dep't of Educ.*, 853 F.2d 853 (11th Cir. 1988); *Doe v. Ala. Dep't of Educ.*, 915 F.2d 651 (11th Cir. 1990).[4]  Nevertheless, the Eleventh Circuit has made clear that "the extent of the deference to be given to the administrative decision is left to the sound discretion of the district court which must consider the administrative findings but is free to accept or reject them." *Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297-98 (11th Cir. 2000); *see also Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 657 n.3 (11th Cir. 1990) (same).  "Courts owe some judicial deference to local administrative agency judgments, though that's typically limited to matters calling upon educational expertise." *Loren

---

[4] The judicial review provision in the IDEA "deviates from the familiar 'substantial evidence' standard for review of administrative decisions." *Escambia Cnty. Bd. of Educ. v. Benton*, 406 F.Supp. 2d 1248, 1256-57 (S.D. Ala. 2005), quoting *Walker*, 203 F.3d at 1297.

6

*F.*, 349 F.3d at 1314 (citation omitted).  The court reviews legal conclusions by the hearing officer under a *de novo* standard.  *Draper*, 518 F.3d at 1284.

**IV.     Discussion**

Plaintiff's Motion asks the court to affirm some portions of the Hearing Officer's decision (paragraphs, 1, 2, & 3, 7, 8, and 9), and overrule other portions (paragraphs 4, 5, 6, and 10).  Plaintiff's Motion also asks the court to find that L.C. is the prevailing party in this case.

**1.     The Challenged Findings**

L.C. has challenged the following Findings by the Hearing Officer:

> Specific Finding 4, which states that "[o]nce the parent initiated a referral on May 19, 2014, the school system's evaluation of the child complied with the appropriate regulation and was conducted in a timely manner." (Doc. # 8-10 at 240).
>
> Specific Finding 5, which states that "[the] decision … that the child was not eligible for special education services under the category of other health impaired was supported by evidence information, and assessments in the possession of the local education agency.  While a medical diagnosis of Tourette Syndrome was presented, the medical diagnosis alone was not sufficient to justify Petitioner being identified in the area of other health impairment." (Doc. # 8-10 at 240).
>
> Specific Finding 6, which states that "[a]t the time of the first eligibility meeting, the information considered by the IEP eligibility team supported its decision that Petitioner's impairment did not adversely affect his educational performance." (Doc. # 8-10 at 241).
>
> Specific Finding 10, which states "[i]n all other respects the local education agency complied with the Individuals With Disabilities Education Improvement Act."

(Doc. # 8-10 at 242).

The Individual with Disabilities Education Act ("IDEA") provides federal assistance to states that provide a free and appropriate education to children with disabilities by offering each eligible student special education and related services under an individualized education program

("IEP"). 20 U.S.C. § 1412(a)(1)(A). The IDEA and Alabama's implementing regulations have thirteen separate categories of eligibility, each with its own requirements. *Jefferson Cty. Bd. of Educ. v. Lolita S.*, 977 F.Supp. 2d 1091, 1098 (N.D. Ala. 2013), *aff'd*, 581 Fed.App'x 760 (11th Cir. 2014).

The IDEA contains "an affirmative obligation of every [local] public school system to identify students who might be disabled and evaluate those students to determine whether they are indeed eligible." *N.G. v. D.C.*, 556 F.Supp. 2d 11, 16 (D.D.C. 2008) (citing 20 U.S.C. § 1412(a)(3)(A)). This obligation is known as "Child Find," and a local school system's "[f]ailure to locate and evaluate a potentially disabled child constitutes a denial of FAPE." *Id*. In addition to Child Find obligations, a state must evaluate a child for a disability under the IDEA upon the request of the child's parent. 20 U.S.C. § 1414(a)(1)(B).

Here, the Hearing Officer determined that the System failed to comply with its Child Find obligation and that it failed to consider B.C.'s parents equal participants. These conclusions are not challenged. Plaintiff essentially argues that the System erred when it found B.C. not eligible for special education services, and the Hearing Officer erred in affirming that decision. Plaintiff's argument is that B.C. has Tourette Syndrome, and should have been entitled to an IEP. The court addresses the specific findings related to this contention below.

### A. Specific Finding 4

In Specific Finding 4, the Hearing Officer concluded that "[o]nce the parent initiated a referral on May 19, 2014, the school system's evaluation of the child complied with the appropriate regulation and was conducted in a timely manner." (Doc. # 8-10 at 240).

The record evidence before the court demonstrates that the evaluation was certainly accomplished in a timely manner. B.C.'s parents referred him for a special education evaluation

8

on May 19, 2014.  (Doc. 8-14, p. 11).  The District conducted an observation of B.C. the day after the parent referral.  (Doc. 8-12, p. 4).  B.C.'s special education referral meeting was held on May 28, 2014.  Considering the end of school and the intervening Memorial Day Holiday on May 26, 2014, the referral meeting, too, was conducted in a timely manner.  The team accepted the referral and agreed to conduct a special education evaluation.  (Doc. 8-14, pp. 15, 19-23).

In conducting the special education evaluation, the regulations required the District to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining whether the child is a child with a disability.  Ala. Admin. Code § 290–8–9.02(1)(l); 34 C.F.R. § 300.304(b)(1). The record makes clear that the District conducted an achievement test, intelligence test, behavior rating scales, observations, examined standardized assessments, obtained medical documentation and collected B.C.'s work samples.  (Doc. 8-12, pp. 4-9).  After gathering the relevant information, the eligibility meeting was conducted in July 2014.  The team thoroughly analyzed whether B.C. satisfied the criteria to be considered disabled in the areas of "other health impairment" and "specific learning disability." (Doc. 8-12, pp. 4-9; Doc. 8-4, p. 20; Doc. 8-5, pp. 20-21).  The "Other Health Impairment" criteria specifically states that a "medical diagnosis alone is not enough to justify being identified in the area of other health impairment. The impairment must adversely affect the educational performance of the child."  Ala. Admin. Code § 290–8–9.03(9). Similarly, the "Specific Learning Disability" criteria also require a finding that "[t]he child does not achieve adequately for the child's age or meet State-approved grade-level standards … ." Ala. Admin. Code § 290–8–9.03(10)(c).

B.C.'s testing and school records showed that he was achieving at or above grade level and was mastering the standards for his grade level. (Doc. 8-21, pp. 13-16; Doc. 8-4, p. 21, Doc.

8-14, p. 8).  Progress monitoring of reading skills administered in the classroom showed B.C. was on target or above.  (Doc. 8-4, p. 3).   B.C. was exceeding benchmarks on the DIBELS assessment the District administered.  (Doc. 8-14, pp. 4-6; Doc. 8-4, p. 4).  B.C. displayed average scores on the behavior rating scales.  (Doc. 8-5, p. 20).  Dr. John Goff's reading fluency scores for B.C. were consistent with the District's scores.  (Doc. 8-6, p. 20; Doc. 8-12, pp. 6, 35).  Dr. Goff's test results revealed B.C. was performing in the normal range for same age children.  (Doc. 8-4, p. 22; Doc. 8-12, p. 6).  B.C.'s second grade teacher did not see anything that was interfering with B.C.'s ability to perform academically. (Doc. 8-4, p. 5).

Eligibility for special education has three components: (1) the child must have a disability under the criteria of the Alabama Administrative Code, (2) the disability must adversely affect the child's educational performance, and (3) the disability must require the need for specially designed instruction.   Ala. Admin. Code §§ 290–8–9.02, 290–8–9.03; *Alvin v. Ind. Sch. Dist. v. A.D.*, 503 F.3d 378, 383 (5th Cir. 2007); *Marshall Joint Sch. Dist. No. 2 v. C.D.*, 616 F.3d 632, 640-41 (7th Cir. 2010).  The evidence regarding B.C.'s testing and academic achievement simply does not show that B.C.'s Tourette Syndrome caused the requisite adverse effects necessary to qualify him for special education services during the time at issue.  Therefore, the court affirms the Hearing Officer's Specific Finding 4.

### B. Specific Finding 5

In Specific Finding 5, the Hearing Officer concluded that "[the] decision … that the child was not eligible for special education services under the category of other health impaired was supported by evidence information, and assessments in the possession of the local education agency.  While a medical diagnosis of Tourette Syndrome was presented, the medical diagnosis

alone was not sufficient to justify Petitioner being identified in the area of other health impairment." (Doc. # 8-10 at 240).

As discussed above, the "Other Health Impairment" criteria specifically states that a "medical diagnosis alone is not enough to justify being identified in the area of other health impairment. The impairment must adversely affect the educational performance of the child." Ala. Admin. Code § 290–8–9.03(9).  Because the testing and educational records did not support such a conclusion at that time, the court affirms the Hearing Officer's Specific Finding 5.

### C.  Specific Finding 6

In Specific Finding 6, the Hearing Officer concluded that "[a]t the time of the first eligibility meeting, the information considered by the IEP eligibility team supported its decision that Petitioner's impairment did not adversely affect his educational performance." (Doc. # 8-10 at 241).

The information which supported the decision that B.C.'s impairment did not adversely affect his educational performance included B.C.'s testing and school records.  This evidence showed that B.C. was achieving at or above grade level, was mastering the standards for his grade level, and was meeting benchmarks. (Doc. 8-21, pp. 13-16; Doc. 8-4, p. 21, Doc. 8-14, pp. 4-8, Doc. 8-4, pp. 3-4, Doc. 8-5, p. 20).  Dr. John Goff's reading fluency scores for B.C. were consistent with the District's scores, and Dr. Goff's test results also revealed B.C. was performing in the normal range for same age children. (Doc. 8-4, p. 22; Doc. 8-6, p. 20; Doc. 8-12, pp. 6, 35).  Therefore, the court affirms the Hearing Officer's Specific Finding 6.

### D.  Specific Finding 10

In Specific Finding 10, the Hearing Officer concluded "[i]n all other respects the local education agency complied with the Individuals With Disabilities Education Improvement Act."

(Doc. # 8-10 at 242). Plaintiff does not present any specific argument as to why this Finding should not be affirmed. (*See, generally*, Doc. # 17-1 at pp. 16-21). Therefore, the court affirms the Hearing Officer's Specific Finding 10.

### 2. Prevailing Party

Despite the ultimate finding on Plaintiff's Due Process Complaint that B.C. was not eligible for special education services, the Hearing Officer found that the District had failed to provide a FAPE to B.C. by failing to (1) comply with its Child Find duties and (2) include B.C.'s parents as equal participants in the process. (Doc. # 8-9 at 24-25; Doc. # 8-10 at 238). In connection with the violation of its Child Find duties, the District was ordered to provide training to participating school system personnel regarding special education services, to include a specific discussion and/or information regarding Tourette Syndrome. (Doc. # 8-10 at 239). Plaintiff argues that, based on these findings, she is the prevailing party.

The IDEA provides that "the court, in its discretion, may award reasonable attorneys' fees as part of the costs ... to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i)(I). However, the IDEA does not define "prevailing party." Federal courts have applied the same meaning of the term "prevailing party" in the IDEA context as that used when assessing the prevailing party issue under 42 U.S.C. § 1988. *Mitten ex rel. Mitten v. Muscogee Cty. Sch. Dist.*, 877 F.2d 932, 936 (11th Cir. 1989); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("[P]laintiffs may be considered 'prevailing parties' for [§ 1988] attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278-79 (1st Cir. 1978))).

"Consequently, 'parents may bring an independent claim for attorney's fees in a district court after their child prevails' in a state administrative hearing." *J.S.R. by Childs v. Dale Cty. Bd. of Educ.*, 2015 WL 5692804, *9 (M.D. Ala. 2015) (quoting *Matthew V. ex rel. Craig V. v. DeKalb Cnty. Sch. Sys.*, 244 F.Supp. 2d 1331, 1335 (N.D.Ga.2003)); *see also Robert v. Cobb Cnty. Sch. Dist.*, 279 Fed.App'x 798, 800 (11th Cir. 2008). The question, therefore, is whether Plaintiff was the prevailing party with regard to her Due Process Complaint.

The Hearing Officer's findings that the District had failed to provide a FAPE to B.C. by failing to comply with its Child Find duties and failing to include B.C.'s parents as equal participants in the process resulted in an instruction to Defendant to conduct "training regarding special education services (and the identity of those who may need such services) that a specific discussion and/or information regarding Tourette Syndrome shall be provided to participating school system personnel." (Doc. # 8-10 at p. 7). However, what Plaintiff actually sought in her Due Process Complaint was a ruling that B.C. is eligible for special education services and that an IEP must be developed for B.C. (Doc. # 8-10 at pp. 13-18). Without questions, these were Plaintiff's primary objectives. But these objectives simply were not met. (Doc. # 8-10 pp. 6-10). Rather, it was the second filing, on November 3, 2014, which accomplished the referral of B.C. for special education services. (Doc. # 8-9 at 20).

A party is generally considered to be the prevailing party if she succeeds "on any significant issue in litigation which achieves some of the benefit [ ] sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In other words, a prevailing party must obtain a "material alteration of the legal relationship of the parties." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93,

109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). The Hearing Officer's decision did not cause a material alteration of the legal relationship between the parties here. The second referral of B.C., which was proceeding concurrently with the prosecution of Plaintiff's Due Process Complaint, accomplished that. Under these circumstances, the court cannot say that Plaintiff was the prevailing party below.

## V.     Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is due to be denied. The Findings of the Hearing Officer challenged by Plaintiff are due to be affirmed. A separate order will be entered.

**DONE** and **ORDERED** this April 19, 2016.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE